Bradbury, J.
The plaintiff in error, William Goins, •was indicted for aiding and abetting murder in the first degree; the day set for his trial having arrived, there was in attendance a panel of thirty-six jurors, from which a jury to try him was to be selected as the statute in such case provides. ‘Thereupon the prosecuting attorney, by leave of court, en *460 tered a nolle prosequi to the charge of murder in the first degree. The court then proceeded to impanel from the thirty-six jurors in attendance on the case, a jury for his trial. To this no objection was offered; but after plaintiff in error had peremptorily challenged two jurors, and his challenge of Christian Stettler had been overruled, as will hereafter appear, he peremptorily challenged him; the court, however, holding the prisoner to be entitled to only two peremptory challenges, overruled this challenge, and Stettler sat as a juror in the case; to all of which the plaintiff in error excepted.
The right of peremptory challenge is to be determined by the provisions of sec. 7272, Rev. Stats., as amended in 1888, (84 Ohio L. 86), together with those of sec. 7277. Section 7272 as amended, reads: “ Every person indicted * * * (for a capital offense) * * * shall be entitled to challenge-sixteen of the jurors peremptorily.” 84 Ohio L. 86. And sec. 7277 provides, that “ except as otherwise provided * * * every defendant may peremptorily challenge two of the-panel.” It is only “ otherwise provided ” in capital offenses,, so that, except in capital cases, the defendant in a criminal case is only entitled to two peremptory challenges. After the nolle had been entered to the deliberation and premeditation charged in the indictment, the prisoner did not stand indicted for a capital offense; the charge against him was reduced to aiding and abetting murder in the second degree, and his right of challenge was governed by sec. 7277, 'Rev. Stats. That the jury had been drawn and summoned under sec. 7267, Rev. Stats., made no difference in this respect. He-may have been entitled to be tried by a jury drawn and summoned in the usual way if he had so demanded; hut whether he was or not, as he did not choose to exercise the right, his-neglect to do so did not enlarge his right to peremptory challenges, this right being determined by the offense charged against him, and not by the manner in which the jury had been brought in. In this ruling of the court we see no error.
Christian Stettler was called and examined touching his qualifications as a juror in the case. He stated that the father of the deceased had talked with him about the killing, and *461 went into the particulars of the transaction as if he knew the facts; that he had also read of the case in a newspaper, and had formed an opinion respecting the guilt of the principal. Thereupon the defendant challenged him for cause. The court then, as the statute directs, inquired further of the juror, who stated that he believed he could render an impartial verdict in the case, and that he could do so even if the principal were on trial. The challenge was then overruled, and the prisoner excepted.
In respect of challenge for cause, sec. 7278, Eev. Stats, as amended (81 Ohio L. 54), provides: * * * '“if a juror has formed * * * an opinion, * * * the court shall thereupon proceed to examine such juror as to the grounds of such opinion; and if such juror shall say that he believes he can render an impartial verdict notwithstanding such opinion, and if the court is satisfied that such juror will render an impartial verdict on the evidence, it may admit him as competent to serve in such case as a juror.”
The court did not expressly find that it was “ satisfied ” that the juror could render an impartial verdict in the case, but the fact of admitting him as a juror must be* taken to include, by necessary implication, a finding by the court that it was satisfied of his impartiality. Upon no other ground could the court legally admit him as a juror.
The trial court had before it the juror and his statements. We have these statements embodied in a bill of exceptions, from which it appears not only that the juror had read an account of the case in a newspaper, but had received from the father of the deceased, a narrative of the circumstances of the homicide, and had at one time formed an opinion respecting the guilt of the principal. Under that state of fact, to admit him as a juror was an extreme application of the discretion permitted by the statute; yet, standing by itself, it is not such an abuse of that discretion as to warrant a reversal of the judgment on that ground alone; but in view of the difficulty nearly all men experience in getting rid of opinions based upon hearing a detail of the circumstances of a transaction by one who professes to know them, it might well become an im *462 portent factor in the case, were we reviewing the whole record to ascertain if a fair trial had been had and substantial justice done.
3. The principal in the homicide having been convicted and sentenced for manslaughter, the prisoner moved the court to order that he should not be put upon trial for a higher degree of oifense; and in support thereof, introduced the record of the trial, conviction and sentence of the principal. The motion was overruled, and the prisoner tried and convicted of murder in the second degree. Whether this qixestion could be raised in limine by a motion, we need not stop to enquire, for-the x’ecord discloses the x’esult of the tx'ial of the principal, and the íxxotion for a new trial brought tlxe question again before-the court.
The precise question whether in the case of a cx’ixxxe admitting of degrees of guilt, where the principal offender has been 'tried and convicted of one of the lower degrees, one indicted with hiux as axx aider and abettor can afterwards be tried and convicted of one of the higher degrees of the exime, has never been decided by this court; but cases decided by it can be-found, which, in their principle, determine the question.
The statute relating to aiders and abettor’s, provides that “ Whoever aids, abets, or procures another to commit any offense, may be prosecuted and punished as if he were tlxe principal offender.” Rev. Stats, sec. 6804.
Under this statute, or others like <it in this respect, aiding, abetting or procuring a crime to be committed has been held to constitute a substantive offense, and that the aidex-, abettor or px’ocurex’, might be tried befox’e the principal offender. 19' Ohio, 131; 18 Ohio St. 496; 37 Ohio St. 178. If, as has been held, this crime is a substantive one, for which the offender may be tried and convicted before the conviction of tlxe principal, it necessarily follows that he should be convicted of that degree of the crime which the evidence against him establishes; and if this may be done before, no reason is apparent why it should not be done after the trial of the .principal; and the circumstance that the principal offender’, thx*oxxgh failure of pi’oof or caprice of the jury, had been convicted of a lower- *463 grade, or even acquitted, before the aider or abettor was put on trial, cannot affect the question of the guilt or innocence of the latter. The degree of the guilt of the aider and abettor,, as well as the question whether he is guilty at all, is to be determined solely by the evidence in the case, and the record of the trial of the principal is not competent evidence for either of those purposes. We therefore hold that it was not error to place the prisoner on trial for a higher grade of the offense than that of which his principal had been convicted.
4. The court on the trial admitted in evidence, over the objection of the plaintiff in error, certain declarations of one Samuel Thomas, who was jointly indicted with him, but not then on trial. The exception to the ruling of the 'court in admitting evidence of these declarations, as to all except two of them, may be disposed of on the ground that they were made-in the presence of, or so near to the plaintiff in error that he must be held to have heard them. The two others having been made under similar circumstances, only one-of them will be noticed, that testified to by Wallace Standish, which is as follows : “ If we get them we. will give them hell.” Its admissibility depended upon its having been made by a co-conspirator-in furtherance of the common purpose. Much latitude is necessarily left to the trial court in determining whether or'not there has been introduced sufficient prima faoie proof of a conspiracy, to admit evidence of the acts and declarations of one claimed to be a co-conspirator with the defendant on trial. In the case at bar there was some evidence of a common purpose among the colored men; whether it extended beyond a purpose to exercise the right to pass along the public streets of the city may admit of grave doubt; but the determination of that question is not necessary to determine the question of the admissibility of the evidence. There being some evidence of a common purpose, the declarations of a co-conspirator in furtherance of it was competent evidence, and the.court did not err in admitting it to go to the jury. Counsel contend, that to render the acts and declarations of a co-conspirator competent evidence, the indictment should have, in express terms, charged a conspiracy. This is true where the act of conspiring *464 is itself the crime charged; but where some other act is the real offense, and the conspiracy is a common purpose leading to the commission of the main criminal act, a conspiracy need not be alleged in express terms, and if any allegation in respect thereof is at all necessary, the charge in the indictment that it was jointly done is sufficient for that purpose.
5. The plaintiff in error offered to prove certain cries or -exclamations of the white or Irish crowd, by which, as he claimed, he and his fellow colored men were subsequently attacked; they were excluded and he excepted.
It was the night after the April election, and a large crowd ■of people, mostly white, had assembled about and between the post office and the De La Flora saloon, two well known points in the city of Lima. Some colored men, not shown to have exceeded ten or twelve, were about in the crowd, some four or five of whom had been passing along the street in and out of the saloons and through the crowd, and by something in their bearing, or reported sayings, seem to have excited the .animosity of the white portion of the crowd. One of them was drunk, and perhaps one or more of the others showed some slight effects of liquor. A policeman had ordered them to go home. They started north on Main street, and had gone a short distance, estimated from twenty to thirty yards,' when a party, estimated to contain from twenty to thirty or more young white men, mostly Irish, started after them. At this point plaintiff in error offered to prove that some of this party cried out: “ There go the black sons of bitches; let’s follow and give them hell.” Daniel Steinour then testified that he met the colored men, four in number, about a square further north, near what he called “ Rush’s tin shop;” that behind them was the white party, increased to from fifty to seventy-five in number, some of whom were gathering stones; that the white party went on north at a pretty lively gait, and soon after.he saw the crowd moving back and forth among themselves, and heard the rattle of stones. The plaintiff in error proposed to prove by the witness that cries, similar to those he before offered to prove, came from the white party as they were gathering the stones. In both instances, above re *465 ferred to, the evidence was rejected by the court, and exceptions taken. The state claims in argument that the first cries occurred too long before the homicide to be admissible, and the last after it was in fact committed, and that they on thole respective grounds, were properly rejected. The claim is not borne out by the bill of exceptions. No doubt there is some uncertainty respecting the exact order in which events occurred that night, which is greatly intensified as we approach closely the begining of the fight; but there is abundant evidence tending to show that these cries -were made before the killing, and near enough to it to explain the purpose and reflect upon the attitude of the white party at the moment of the attack.
It is also claimed by counsel for the state that the deceased, when these cries were made, had not yet joined the mob, and that there was no evidence of a conspiracy between him and the balance of the white party, or even between the members of the white party, to injure or wrong the colored men. It is probably true that when the first set of cries were made the deceased had not joined the crowd, but did so about the time the last set were uttered, for it seems entirely clear that he, with some ten or fifteen more men, rushed out of Manning’s saloon and joined it just before the conflict began. The claim that there was no evidence of a common purpose amon.g the white crowd to wrong the colored men is not supported by the bill of exceptions. The evidence that there was such a purpose can be gathered from almost every page of it. The colored men went into Manning’s- saloon where the deceased at the time was; they remained a moment, then went out and were at once followed by the deceased and ten or fifteen others (nearly all of whom were in the saloon), and he was one of those who, it is claimed, circled round and hemmed in the colored men a moment before the fight began. It may be he was merely an innocent spectator, but the circumstances justify the inference that he had grasped the purpose of the crowd, and joined in its execution. But whether he had or not, it can *466 not affect this question of the admissibility of the cries of the mob. The colored men could not be required to single out and separate friend from foe. The claim of the plaintiff in error was that he and his fellows saw behind and around them a mass of men fifteen to twenty times their number, apparently hostile; and he had a right to show to the jury the desperate nature of the situation as it appeared to him and them, and in this view of the question it is -wholly immaterial whether or not the deceased had joined in the alleged purposes of the mob, or was there merely as an innocent spectator, for his presence,, as well as that of every other innocent spectator, swelled the numbers of the white party that was menacing the colored men.
The colored men from their stand point had a right to treat the white party as a unit; to show to the jury its origin, its purposes and its appearance; how can this be done but by proof of the acts and declarations of its members ? The cries of a mob have been admitted in evidence from an early period of our law, whenever it was material to show its purposes and temper; indeed they are in the nature of verbal acts, accompanying and explaining the movements of the mass, and have' little or no analogy to mei’e uncommunicated threats of an individual, with which counsel for the state insist they should be classed. In this case they were made so short a time before the attack which plaintiff in error claims was made on the colored party, by the mob, that they reflect in a most important manner upon the attitude of the white party at the moment the attack was made, and upon that ground were also admissible. The nature of the transaction required the fullest investigation of every circumstance thatlled to the creation of the white party, and by which its existence and progress can be traced to its culmination. We think the rejection of this evidence was error.
6. Counsel for plaintiff in error prepared and presented to the court certain special instructions, which he requested to be given to the jury ; the court declined to give any of them, and proceeded to charge the jury. To this refusal of the court to charge the special instructions requested, to certain specified *467 parts of the charge, and to the charge as a whole the plaintiff in error excepted.
The first proposition of the first request reads that before the jury can consider the acts and declarations of co-conpsira-' tors, made out of the presence of the defendant on trial, it must appear, “ That there was formed by the parties a combination or conspiracy for the purpose of the committing of the crimé charged or some unlawful act of similar kind.” * * * This proposition states the law too favorably for the plaintiff in error. ' The authorities are conclusive that the conspiracy is sufficiently shown when it is made to appear that the common purpose was to commit an unlawful act quite dissimilar from the crime in fact committed, if the latter crime was one that might have been contemplated, reasonably, as likely to' result from the attempt to commit the act intended; and some respectable authorities go yet further, and hold the conspirators responsible for an accidental homicide of a co-conspirator when committed while he is engaged in advancing the common unlawful purpose. 4 American & English Encyclopedia of Law, 619, and authorities cited. But the first proposition is sufficient to justify the court in refusing this request.
The second proposition requested was not, in view of the evidence, of sufficient importance to make its rejection error.
7. The third and fourth propositions requested by the plaintiff in error, and refused by the court, arc as follows :
Third request — “ It is not sufficient to establish the guilt of defendant Goins of aiding and abetting Harrison in the commission of the homicide charged in the indictment, that he was present on the scene, with others where the alleged killing was done, for he may have been present not knowing that any crime was about to be committed; and if he was not there in furtherance of an understanding or common purpose to commit some unlawful act, and was in company with Harrison without knowledge that Harrison or any of his co-defendants contemplated the commission of an offense, he is not responsible for the acts of Harrison or his other co-defendants, if he, *468 Goins did not participate in the commission of the offense charged.”
Fourth request — “ Again, if the only purpose made known to Goins prior to the killing of Hughes, and the only one contemplated or entered upon by him, was a defense of himself and his companions from an attack by a party of men superior in numbers and strength which had been threatened, and neither the defendant nor his comrades were to be aggressors, or attack the opposing party, then such common purpose of defense merely was not unlawful and criminal.”
The two preceding propositions are closely related to each other and will be considered together. Piad no evidence been given by the defense, but instead the case submitted to the jury on the evidence of the state alone, yet that evidence was fairly susceptible to a construction that made those two propositions applicable. When from that evidence we consider the great numerical superiority of the white crowd, the conduct of the colored men, and the circumstances of the attack, together with the absence of any testimony showing any ill will on the part of the colored men towards the deceased, or any other individual of the white crowd, unless towards Casey with whom Crowder had quarreled early in the evening, and that there was no evidence of a purpose to harm him, we at once see strong grounds for Goins to contend that the purpose of himself and his comrades, in the light of that evidence alone, was none other than that assumed in those propositions. Therefore those propositions were pertinent and should have been given to the jury. And the jury on that evidence alone, aided by pertinent instructions, might well have found a verdict in favor of plaintiff in error. When, however, we consider the evidence for the defense, the necessity is at once apparent, that these propositions, or similar ones, with even greater elaborations, should have been given to the jury to enable them to determine the issue intelligently by applying correct and pertinent legal propositions to the evidence' before them. This evidence sufficiently appears in another part of this opinion and will not be repeated here. The court erred in refusing to charge these two propositions, *469 and, upon a careful examination of the whole charges, we find no substitute for them.
8. Fifth request — “ And further, if the defendant, Goins, and his co-defendants were in the exercise of their lawful rights in passing along the streets at the time of the conflict wherein Hughes was killed, and neither of the accused parties began the affray or attack, then the defendant and those accused with him had the right to repel the assault with such force as was necessary to do so, and had a right to defend themselves from danger to life or great bodily harm ; and if they were suddenly assailed or surrounded by superior numbers, armed with weapons dangerous to life, or calculated to do great bodily harm, the defendants had a right to stand on their defense, to repel force by force even to the taking of life, if they believed, and had reasonable grounds to believe, that it was necessary to do so to prevent either death or great bodily harm to themselves, and if necessary they may use such weapons as will accomplish the purpose.”
This proposition ought to have gone to the jury; it was applicable to the evidence given in behalf of plaintiff in error. That evidence tended to prove that the plaintiff in error and his comrades were passing along the street in a lawful manner; that they were pursued by a mob which outnumbered them more than twenty times; that the mob overtook, surrounded and attacked them with stones in a most .violent and savage manner, and that what they did was in their lawful defense against this violence. The evidence in the case called for a full and careful statement of the principles of the law of self-defense, yet only six or eight lines of a long and elaborate charge were directly devoted thereto, and they were followed by a statement considerably longer and much more explicit, limiting and qualifying the right. Subsequently, directions were given to the jury with a view to aid them in applying the law of self-defense, as it had before been laid down to them, to the evidence in the case; but we think these directions were not-as full and explicit as the evidence and the cireumstances of the case required. However, had they been sufficiently full and explicit in this respect, yet they were pre *470 faced by a statement that substantially deprived plaintiff in error of their benefit. This statement required the jury to find that the plaintiff in error and his comrades “ were without fault aud in the peace of the state” before they would be clothed with the right of self-defense. Ordinarily this language might have been a harmless rounding up of a sentence, but when we see that evidence had been given from which the jury might have found that at least one of these colored men was drunk, one or more of the others slightly in liquor, that 'their conduct was regarded as insolent and offensive, that they had been ordered to go home by a peace officer, they may have well supposed that colored men so conducting themselves were not free from fault and not in the peace of the state, and therefore not clothed with the right of self-defense. The jury should have been made to understand that it was not the province of the white crowd to prescribe and regulate the conduct and demeanor of colored men, though one or more of them may have been drunk and insolent, or all displayed a spirit of offensive bravado; that notwithstanding such conduct, the colored men while in the exercise of their lawful right to pass and repass along the streets of the town, were still clothed by law with the right to defend themselves from the malicious and violent attack of a numerous mob. We have carefully read the evidence, and can only account for the verdict in this case upon the ground that the jury misconceived the law in this or some other respect.
In this connection, and in the light of the evidence, we' think the following portion of the instructions given to the jury was prejudicial to the plaintiff in error. “ That the Irish boys, white people, or whoever they may have been, who are claimed to have been connected in the conflict in which Patrick Hughes was killed, as the antagonists of the prisoner and those with him, or in any controversies prior to that time, are not now upon trial, nor are their acts, sayings, or doings, however wicked or criminal, under investigation in this case, with a view to determine the extent of the guilt of such, parties.” It is true the “ Irish boys ” were not upon trial in the sense that the jury could convict them, but they formed a *471 party hostile to the colored men,' and the more violent, malicious and criminal their conduct was made to appear, the more complete was the justification of the colored men. It was, as appears by the bill of exceptions, the central purpose of counsel for plaintiff in error, to exhibit to the jury the conduct' of the white crowd in its, most offensive and criminal aspect. The great mass of his evidence had been directed to that sole end. The justification of the means used by the colored men to repel the attack, depended to a great extent upon its violent and savage character, and any admonition to the jury tending to divert their attention from this feature of the case, could not be' otherwise than highly prejudicial to the defense.
9. The 6th request was as follows: “ If you (the jury) find from the evidence, that Frederick Harrison, named as principal in the indictment, did take the life of Patrick Hughes, but did it in a sudden quarrel, or in the heat of passion, his offense would be but manslaughter ; and if you further find that the defendant William Goins, did no overt act, and took no active part in the killing, but was merely present when the quarrel arose, or fight began, you cannot in such case find him guilty as an aider and abettor of Harrison.” In view of the evidence this charge should have been given. No doubt there may be such a crime as aiding and abetting manslaughter. This court has so held, 10 Ohio St. 459, but each case must stand upon its own circumstances, and in the case at bar there was no evidence that the plaintiff in error said a word or did an act, at the time the fight began or was in progress, that could be construed as aiding or abetting Harrison in taking the life of the deceased ; so that if that act of Harrison was the result of a sudden quarrel, or done in the heat of passion, instead of being done pursuant to a prior conspiracy the plaintiff in error had no criminal connection with it, and was entitled to have the jury charged accordingly, and the refusal was error.
10. Misconduct of the jury is alleged, and the affidavits of the jurors offered to prove it; from which it appears that the jury at first stood six for assault and battery, and as a com *472 promise the six agreed to' vote for manslaughter, and the vote then stood six for manslaughter and six for murder in the second degree; that it was then agreed to prepare twenty-four ballots, twelve for manslaughter and twelve for murder in the second degree, place all of them in a hat and each juror draw one ballot therefrom, and render a verdict either for Manslaughter or murder in the second degree, as the majority should appear; that the first drawing was a tie, but the second one resulted in eight ballots for murder in the second degree and four for manslaughter, and thereupon, according to the agreement, a verdict was rendered for murder in the second degree. There was no other evidence of this misconduct than the affidavits of the two jurors ; for, while an affidavit of the prisoner was offered in corroboration of them, it is apparent on its face that his statement was only hearsay, and for that reason properly rejected. There only remained in proof of the alleged misconduct the two affidavits of the two jurors; this was ample proof in the absence of evidence to contradict them, if the evidence was competent at all. The court held them not competent, which consequently left the allegation of misconduct without proof. The almost unbroken current of authority supports this holding (Kent v. State, 42 Ohio St. 426 ; Thompson and Merrium on Juries, 539), and thus it may appear to all the world, by the subsequent statements of the j urors, that the liberty of a citizen has been gambled away in a jury room, yet the court is powerless to interfere, because the policy of the law is, first, to seclude the jury, and second, not to allow their evidence to impeach their verdict.
As a general rule, no doubt, this doctrine is founded on the soundest principles of public policy, otherwise the rendition of a verdict, in nearly every jury trial,' would become merely the beginning of a new controversy over the mode of its rendition, endangering the stability of verdicts and the security of judgments rendered thereon ; and the time and attention, of courts would be wasted in investigating alleged misconduct of jurors, frequently of the most frivolous character. But a case like this at bar strains the principle to its utmost tension, and suggests a doubt whether there may not be found a carefully *473 guarded exception to a rule, tbe universal application of which may present a spectacle so discreditable to our jury system.
It may be said there is a remedy afforded in the power of the court to grant new trials on the ground that the verdict is not supported by, or is contrary to, the manifest weight of the evidence. This is no doubt true to some- extent, but its inefficiency is apparent to all who are familiar with the rules of law and the practice of courts on the subject of new trials, and is especially exemplified by the case at bqr.
We do not care, however, to press the question further; its determination is not necessary to a decision of the case, but, being one of the questions presented by the record, we give it this passing notice.

Judgment reversed.